# EXHIBIT A

# UNITED STATES DISTRICT COURT
## *for the District of Arizona*

*In the Matter of the Search of*
(Briefly describe the property to be searched or identify the person by name and address)

3231 E. Flower Street, Unit B, a multi-unit housing complex located in Tucson, Arizona, occupied by Eduardo SILVA and Rafael SILVA-FREGOSO

USAO#: 2025R01156

No.

25-07424MB

SEARCH WARRANT

TO:     Any authorized law enforcement officer

Application and Affidavit having been made before me by a federal law enforcement officer, requesting the search of the following ☐ person or ☒ premises known as *(name, description and/or location)*:

**See Attachment A, attached and incorporated by reference herein**

located in the District of Arizona is believed to conceal *(identify the person or describe the property to be seized)*:

**See Attachment B, attached and incorporated by reference herein**

I find that the affidavit(s), and/or any recorded testimony, establish probable cause to search and seize the person or property described.

YOU ARE COMMANDED to execute this warrant on or before _____14 DAYS_____
*(not to exceed 14 days)*

☐     in the daytime 6:00 a.m. to 10:00 p.m.          ☒     at any time in the day or night as I find reasonable cause has been established.

You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the United States Magistrate Judge who authorized this warrant.

Subscribed and Sworn to telephonically.

4/22/2025 at 11:25 a.m.
_____
*Date & Time Issued*
Tucson, Arizona
_____
*City and State*

_____
*Judge's signature*
Hon. D. Thomas Ferraro, United States Magistrate Judge
_____
*Printed name and title*

US v. Eduardo Silva, et. al.          CR25-01890          0329

# EXHIBIT B

**ATTACHMENT A**
**DESCRIPTION OF PROPERTY TO BE SEARCHED**

The residence is located at 3231 E. Flower Street, Unit B, Tucson, AZ 85716 (SUBJECT RESIDENCE). The SUBJECT RESIDENCE is a multi-unit housing complex located in Tucson, Arizona. The SUBJECT RESIDENCE is a tan in color with brown trim and white awnings. The front entrance of the SUBJECT RESIDENCE faces South. The SUBJECT RESIDENCE is located southwest of the E Glenn Street and N Edith Boulevard intersection. The search of the SUBJECT RESIDENCE shall include the entire residence and all outbuildings, trashcans, or storage containers designated for use by the SUBJECT RESIDENCE, and any vehicles parked at, or in front of, the SUBJECT RESIDENCE that have an apparent connection to the SUBJECT RESIDENCE and/or association with Eduardo SILVA or Rafael SILVA-FREGOSO.



# EXHIBIT C

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

All evidence of violations of 18 U.S.C. § 932(b)(3), including:

1) Firearms and evidence of firearm possession to include holsters, magazines, gun cases and firearm components. Ammunition, to include components of ammunition, such as primers, casings, and gun powder.

2) Books, records, receipts, notes, ledgers and other documents relating to transporting, ordering, purchasing, manufacturing and/or distributing firearms.

3) Financial documents, including credit card statements, tax returns, safe deposit records, safe deposit keys, bank records, bank statements, money orders, or other currency transfer receipts, checking account records, cashier's checks, passbooks and other items evidencing the obtainment, concealment and/or expenditure of money.

4) Proceeds of violations of 18 U.S.C. § 932(b)(3), including bulk cash currency or financial records related thereto.

5) Cellular telephones, computers, cellular telephones, and digital storage media linked to Eduardo SILVA and Rafael SILVA-FREGOSO and their contents, to include phone book or contacts list, call history, text messages between co-conspirators and customers to include SMS messages, multimedia messages, and messages transmitted via internet apps, for all such messages both incoming and outgoing, audio/video files, photographs, and any other material stored on the telephones that is related to the above listed offenses.

6) Documents and articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys.

7) Communications between co-conspirators involving the acquisition, transportation, distribution, sale, and storage of firearms and/or proceeds of the sale of firearms.

# RETURN

Case No.:     25-07424MB

| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
|---|---|---|
| | | |

INVENTORY MADE IN THE PRESENCE OF

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

# NOT EXECUTED

❑     This Warrant was Not Executed.
*(check this box if the warrant was never executed and leave the sections above blank.)*

# CERTIFICATION

I declare under penalty of perjury that this inventory is correct and was returned to the designated judge.

Date: _____

_____
Executing Officer's Signature

_____
Printed Name and Title

US v. Eduardo Silva, et. al.                    CR25-01890                                        0332

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## *for the District of Arizona*

| | |
|---|---|
| *In the Matter of the Search of* | No.      25-07424MB |
| *(Briefly describe the property to be searched or identify the person by name and address)* | |
| 3231 E. Flower Street, Unit B, a multi-unit housing complex located in Tucson, Arizona, occupied by Eduardo SILVA and Rafael SILVA-FREGOSO | APPLICATION FOR SEARCH WARRANT |
| USAO#: 2025R01156 | |

I, Taylor Needleman, a federal law enforcement officer, request a search warrant and state under penalty of perjury that I have reason to believe that ☐ on the person of or ☒ on the premises known as *(name, description and/or location)*:

**See Attachment A, attached and incorporated by reference herein**

located in the District of Arizona there is now concealed *(identify the person or describe the property to be seized)*:

**See Attachment B, attached and incorporated by reference herein**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of 18 U.S.C. § 933 (a)(3).

The application is based on these facts:

**See attached Affidavit incorporated by reference herein.**

Digitally signed by ADAM ROSSI
Date: 2025.04.21 14:50:43 -07'00'

Reviewed by AUSA Adam D. Rossi

TAYLOR NEEDLEMAN
Digitally signed by TAYLOR NEEDLEMAN
Date: 2025.04.22 08:59:39 -07'00'

_____
*Applicant's signature*

ATF SA Taylor Needleman
_____
*Printed name and title*

Subscribed and Sworn to telephonically.

4/22/2025

_____
*Date*

Tucson, Arizona
_____
*City and State*

_____
*Judge's signature*

Hon. D. Thomas Ferraro, United States Magistrate Judge
_____
*Printed name and title*

US v. Eduardo Silva, et. al.        CR25-01890        0333

# EXHIBIT E

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Taylor Needleman, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, being duly sworn, depose and state as follows:

## INTRODUCTION

I, Taylor L. Needleman (Affiant), being duly sworn, do hereby depose and state the following:

1. I am employed as a Special Agent (SA) with the United States Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since January 2024. I have completed the Criminal Investigator Training Program and the ATF Special Agent Basic Training program at the Federal Law Enforcement Training Center in Glynco, Georgia, where because of my training, I am familiar with the enforcement of the Federal firearms, ammunition, and explosive laws.

2. I am currently assigned to the ATF Phoenix Field Division, Tucson Field Office, Group I, where we are tasked with investigating firearms and ammunition trafficking, and firearms criminal possession and use. As a Special Agent with ATF, I investigate alleged violations of the federal firearms laws and have participated in several investigations in relation to federal firearms violations during the course of my employment. I am a graduate of Pennsylvania State University in University Park, PA, holding a Bachelor's Degree in Criminology with a minor in Security and Risk Analysis. Prior to my employment with ATF, I was employed as a State College Police Department Intern and a Penn State University Police Auxiliary Officer.

3. The facts in this affidavit come from my personal observations, training, experience, and information obtained from other Special Agents and sources. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## PURPOSE OF AFFIDAVIT

4. I make this Affidavit in support of an application for a search warrant for authorization to search 3231 E. Flower Street, Unit B, Tucson, Arizona 85716 (SUBJECT

US v. Eduardo Silva, et. al.            CR25-01890                          0334

RESIDENCE) further described in ATTACHMENT A and ATTACHMENT B for evidence of violations of:

    a. 18 U.S.C. § 933(a)(3): Conspiracy to Commit Trafficking in Firearms.

5. The (SUBJECT RESIDENCE) is further described as multi-unit housing complex located in Tucson, Arizona. The SUBJECT RESIDENCE is a tan in color with brown trim and white awnings. The front entrance of the SUBJECT RESIDENCE faces South. The SUBJECT RESIDENCE is located southwest of the E Glenn Street and N Edith Boulevard intersection. I seek authorization to search the (SUBJECT RESIDENCE) for the items described in ATTACHMENT B which is incorporated throughout by reference.

6. Based on my training and experience, and that of other more experienced law enforcement officers, and the facts set forth in this Affidavit, there is probable cause to believe that the above-listed violations have been committed by SILVA and SILVA-FREGOSO. There is also probable cause to search the information described in ATTACHMENT A for evidence of those crimes as described in ATTACHMENT B.

## PROBABLE CAUSE

### Initial Investigation

7. In the month of January 2025, ATF began an investigation into a seizure of fifty-seven (57) firearms by the Government of Mexico at the U.S. Border Port of Entry in Sonoyta, Sonora, Mexico. Twenty-two (22) of these firearms traced back to Eduardo SILVA as the original purchaser, who resides at the SUBJECT RESIDENCE (3231 E. Flower Street, Unit B, Tucson, Arizona) and three (3) of the firearms traced back to Rafael SILVA-FREGOSO, who also resides at the SUBJECT RESIDENCE. Additionally, two (2) firearms traced back to Roberto RODRIGUEZ-Mora as original purchasers.

### Firearm Traces

8. Between January 2, 2025, and January 7, 2025, I reviewed Firearms Trace Summaries and identified twenty-two (22) recoveries with SILVA as the purchaser. These recoveries are as follows with "Time to Crime" (TTC) referring to the length of time between the date of a firearm's last known purchase to the date of its recovery by law enforcement in connection with a crime:

| # | Date | Place of Purchase (FFL) | Make | Model | Type | Serial# | Caliber | TTC |
|---|------|-------------------------|------|-------|------|---------|---------|-----|
| 1 | 05/25/2018 | Dominion Firearms LLC | Remington Arms | 1911R1 | Pistol | RHH038435 | .45 | 2383 days |
| 2 | 07/21/2018 | Dominion Firearms LLC | Ruger | 10-22 | Rifle | 0011-58817 | .22 | 2326 days |
| 3 | 12/02/2023 | Murphy's Guns | Umarex | HK416D | Rifle | HB042106 | .22 | 366 days |
| 4 | 01/24/2024 | Turner's Outdoorsman | Smith and Wesson | M&P 22 | Pistol | PJW3582 | .22 | 313 days |
| 5 | 01/24/2024 | Turner's Outdoorsman | Walther | WMP | Pistol | WT023404 | .22 | 314 days |
| 6 | 01/25/2024 | Diamondback Shooting Sports | Mossberg | 600AT | Shotgun | G850133 | 12 Gauge | 313 days |
| 7 | 01/27/2024 | Elite Guns and Ammo | Smith and Wesson | M&P 22 | Pistol | PJZ5531 | .22 | 310 days |
| 8 | 02/15/2024 | Sportsman's Warehouse | Keltec CNC Industries | PMR-30 | Pistol | WYNX61 | .22 | 291 days |
| 9 | 02/24/2024 | Elite Guns and Ammo | Colt | Government | Pistol | GV036211 | .38 | 283 days |
| 10 | 02/24/2024 | Elite Guns and Ammo | Walther | Colt Government | Pistol | WD096261 | .22 | 282 days |
| 11 | 02/24/2024 | Elite Guns and Ammo | CZ | CZ 600 ST2 | Rifle | H173169 | .308 | 283 days |
| 12 | 05/17/2024 | Quick Trip Pawn | Marlin Firearms Co. | Glenfield 60 | Rifle | 26386863 | .22 | 199 days |
| 13 | 07/02/2024 | Elite Guns and Ammo | Ruger | 10/22 | Rifle | R75-36216 | .22 | 154 days |
| 14 | 10/26/2024 | Sportsman's Warehouse | Smith and Wesson | M&P 22 Magnum | Pistol | PKK1135 | .22 | 37 days |
| 15 | 11/14/2024 | Quick Trip Pawn | Beretta | 80X Cheetah | Pistol | Y031490X | .380 | 19 days |

| # | Date | Place of Purchase (FFL) | Make | Model | Type | Serial# | Caliber | TTC |
|---|------|-------------------------|------|-------|------|---------|---------|-----|
| 16 | 11/21/2024 | Quick Trip Pawn | Remington Arms | 870 Express Magnum | Shotgun | A994034M | 12 Gauge | 11 days |
| 17 | 11/29/2024 | Quick Trip Pawn | Winchester | 290 | Rifle | 557014 | .22 | 3 days |
| 18 | 11/30/2024 | Sportsman's Warehouse | Istanbul Arms | Winchester SXP | Shotgun | TR6024-009087SP | 12 Gauge | 2 days |
| 19 | 12/02/2024 | Zona Tactical | Ruger | 10/22 | Rifle | R75-35192 | .22 | 0 days |
| 20 | 12/02/2024 | Catalina Pawn | Ruger | 10/22 | Rifle | 0012-55958 | .22 | 0 days |
| 21 | 12/02/2024 | Catalina Pawn | Armscor | M1911-A1 FS | Pistol | RIA2362077 | .38 | 1 days |
| 22 | 12/02/2024 | Catalina Pawn | Sig Sauer | P322 | Pistol | 73A168837 | .22 | 1 days |

9. Between January 2, 2025, and January 7, 2025, I reviewed Firearms Trace Summaries and identified three (3) recoveries with Rafael SILVA-FREGOSO as the purchaser. These recoveries are as follows:

| # | Date | Place of Purchase (FFL) | Make | Model | Type | Serial# | Caliber | TTC |
|---|------|-------------------------|------|-------|------|---------|---------|-----|
| 1 | 03/29/2024 | Catalina Pawn | Ruger | 01103 | Rifle | 0024-69054 | .22 | 248 days |
| 2 | 11/02/2024 | Sportsman's Warehouse | Ruger | 10/22 | Rifle | R75-76708 | .22 | 30 days |
| 3 | 11/02/2024 | Sportsman's Warehouse | Beretta | 80X Cheetah | Pistol | Y030099X | .380 | 31 days |

10. Between January 2, 2025, and January 7, 2025, I reviewed Firearms Trace Summaries and identified two (2) recoveries with Roberto RODRIGUEZ-Mora as the purchaser. These recoveries are as follows:

| # | Date | Place of Purchase (FFL) | Make | Model | Type | Serial# | Caliber | TTC |
|---|------|-------------------------|------|-------|------|---------|---------|-----|

| # | Date | Place of Purchase (FFL) | Make | Model | Type | Serial# | Caliber | |
|---|------|----------|------|-------|------|---------|---------|---|
| 1 | 05/11/2024 | Turner's Outdoorsman | HS Produkt | Hellcat Pro | Pistol | BE216097 | 9 mm | 205 days |
| 2 | 05/11/2024 | Turner's Outdoorsman | Ruger | AR-556 | Rifle | 1851-47758 | 5.56 | 205 days |

### Further Investigation

11. This information led me to canvass a number of Federal Firearms Licensees (FFLs) to see if they had sold firearms to SILVA, SILVA-FREGOSO, or RODRIGUEZ-Mora (herein referred to as SILVA et al.) and to receive copies of the ATF Form 4473s. ATF Form 4473 is a form purchasers must fill out when buying a firearm that includes biographical information and a series of avowals by the purchaser. This includes an avowal where the purchaser states they are the actual purchaser of the transferee/buyer of the firearm and that they are not acquiring the gun for a third-party, i.e., a straw purchase. Combining E-Trace with the multiple Form 4473's I acquired from FFLs, I learned that Eduardo SILVA made the following additional purchases:

| # | Date | Place of Purchase (FFL) | Make | Model | Type | Serial# | Caliber |
|---|------|----------|------|-------|------|---------|---------|
| 1 | 02/05/2024 | Sportsman's Warehouse | Benelli Italy | Nova | Shotgun | Z1093239K | 12 Gauge |
| 2 | 12/02/2024 | Catalina Pawn | Sig Sauer | P322 | Rifle | 73A168837 | .22 |

12. As to all purchases SILVA et al. marked "Yes" on section 21a of the ATF Form 4473, indicating they were the actual buyers/transferees of the firearms and were not acquiring the firearms for another person. In my training and experience, the repeated purchase of the same type of firearm over a short period of time, down to the make and model, is consistent with someone acting as a straw purchaser and/or is buying guns with intent to sell them.

13. A review of law enforcement databases indicated that SILVA earned a total of $61.15 in wages for the first quarter of 2024. No further wages were reported. Utilizing a basic Google search for the make and model of the firearms purchased by SILVA, ATF was

able to determine the approximate average price of each firearm, and that SILVA had spent, at minimum, $9,950 buying the listed firearms.

14. A review of law enforcement databases indicated that SILVA-FREGOSO earned a total of $193.54 in wages for the first quarter of 2024. No further wages were reported. Utilizing a basic Google search for the make and model of the firearms purchased by SILVA-FREGOSO, ATF was able to determine the approximate average price of each firearm, and that SILVA-FREGOSO had spent, at minimum, $1,200 buying the listed firearms.

15. A review of law enforcement databases indicated that RODRIGUEZ-Mora earned a total of $8,560.20 in wages for the third quarter of 2024. No further wages were reported. Utilizing a basic Google search for the make and model of the firearms purchased by SILVA, ATF was able to determine the approximate average price of each firearm, and that SILVA had spent, at minimum, $800 buying the listed firearms.

**Border Crossings**

16. Law enforcement agents have reviewed U.S. Customs and Border Protection (CBP) data to identify the crossing history of entries into the United States of America by SILVA et al. The following crossings were identified:

**Eduardo SILVA:**

| # | Inbound/ Outbound | Crossing Date and Time (EST) | Method of Travel |
|---|---|---|---|
| 1 | Inbound | 01/26/2025, 12:42 | Vehicle (AZ Plate: C6A8PF) |

**Rafael SILVA-FREGOSO:**

| # | Inbound/ Outbound | Crossing Date and Time (EST) | Method of Travel |
|---|---|---|---|

| 1 | Inbound | 01/26/2025, 12:42 | Vehicle (AZ Plate: C6A8PF) |

**Roberto RODRIGUEZ-MORA:**

| # | Inbound/ Outbound | Crossing Date and Time (EST) | Method of Travel |
|---|---|---|---|
| 1 | Inbound | 01/18/2025, 20:23 | Vehicle (AZ Plate: C6A8PF) |
| 2 | Inbound | 01/26/2025, 12:42 | Vehicle (AZ Plate: C6A8PF) |
| 3 | Inbound | 02/02/2025, 17:45 | Vehicle (AZ Plate: C6A8PF) |

## Surveillance

17. License plate reader data indicates that the vehicles registered to and commonly used by SILVA and SILVA-FREGOSO are located in Tucson, contradictory to the address of 5733 S. Central Drive, Globe, AZ 85501, listed by both individuals on all ATF Form 4473s. Utilizing law enforcement databases, agents identified 3231 E. Flower Street, Unit B, Tucson, AZ 85716 as the mailing address associated with Eduardo SILVA and Rafael SILVA-FREGOSO under multiple of their vehicle registrations. Additionally, Silva Trucking's LLC under Rafael SILVA-FREGOSO is registered under the Federal Motor Carrier Safety Administration (FMCSA) as a company at the address of 3231 E. Flower Street, Unit B.

18. Between February 10, 2025, and March 14, 2025, an analyst reviewed surveillance footage on the address of 3231 E. Flower Street, Unit B, Tucson, AZ 857146. The analyst observed a white box truck arrive at and depart from the residence on several occasions. This vehicle matches the description of a white Freightliner M2 106 bearing AZ plate WZA1KD, registered to Rafael SILVA-FREGOSO. The analyst also observed a white pickup truck arrive at and depart from the residence on several occasions. This vehicle matches the description of a white Toyota Tacoma bearing AZ plate ESILVA, registered to Eduardo SILVA.

19. On Match 14, 2025, I received a phone call from Industry Operations Investigator (IOI) Clint Rollin detailing a possible purchase of a firearm at Elite Guns & Ammo by Eduardo SILVA. ATF SAs, Homeland Security Investigations (HSI) SAs, and a Customs and Border Protection (CBP) Officer conducted surveillance starting at Elite Guns & Ammo at 150 S. Camino Seco, Tucson, AZ.

20. An analyst monitoring surveillance footage observed two males enter a white Toyota Tacoma that depart from the residence at 3231 E. Flower Street. Approximately 30 minutes later, agents observed a white Toyota Tacoma bearing Arizona plate ESILVA park in the parking lot of Elite Guns & Ammo and identified two Hispanic males exit the vehicle and enter the store. Agents identified one of the males to be Eduardo SILVA.

21. Agents began mobile surveillance when the vehicle left the business. I then received a call from the Federal Firearms Licensee (FFL) advising that Eduardo SILVA and his brother, believed to be Rafael SILVA-FREGOSO, had both just arrived at the business. The vehicle was surveilled by agents until it was observed arriving back at the residence of 3231 E. Flower Street.

22. An analyst reviewed surveillance footage recorded between April 7 and April 16, 2025, on the address of 3231 E. Flower Street, Unit B, Tucson, AZ 857146. The analyst observed two male subjects and one female subject at the residence throughout this time period. The analyst again observed the same white box truck and white pickup truck previously described, arrive at and depart from the residence on several occasions. Additionally, the analyst observed a blue pickup truck arrive at and depart from the residence on several occasions, matching the description of a blue Nissan Frontier bearing AZ plate DYA0YW registered to Eduardo SILVA. Additional vehicles observed at the residence include a black SUV, red SUV, and a silver minivan.

23. On April 18, 2025, agents conducted surveillance at the address of 3231 E. Flower Street, Tucson, AZ 85716 and observed multiple vehicles registered to SILVA and SILVA-FREGOSO parked outside the residence, including the white Toyota Tacoma bearing AZ plate ESILVA and the white Freightliner box truck bearing AZ plate WZA1KD. Additionally, agents observed the center unit to be clearly marked as unit B indicated on the wall to the left of the front door.

# EVIDENCE COMMONLY FOUND ON CELL PHONES AND COMPUTERS

### Evidence of Criminal Activity Frequently Found on Phones

24. As described herein and in Attachment B, this application seeks permission to search for evidence and records that might be found in the SUBJECT RESIDENCE, in whatever form they are found. Some of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers, digital media and other storage media. For this reason, I submit that if a computer, digital medium, or storage medium is found in the SUBJECT RESIDENCE, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

25. Necessity of seizing or copying entire computers or storage media. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data in the vehicle. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

26. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying computers and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

27. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices to search and seizure pursuant to this warrant. I seek this authority based on the following:

28. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or

password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

29. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

30. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

31. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

32. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that

US v. Eduardo Silva, et. al.                    CR25-01890                    0344

would unlock the device(s) Suspect to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

33. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

34. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Suspect Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

35. Due to the foregoing, if law enforcement personnel encounter a device that is suspect to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the suspect premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## Evidence Sought During Search

1. Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of firearms often conceal evidence of their trafficking activities in their residences and businesses, or the residences of friends or relatives, vehicles and in surrounding areas to which they have ready access such as garages, carports and outbuildings.

2. Firearms traffickers often conceal evidence in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences. This evidence, which is discussed in detail in the preceding paragraphs, includes firearms, ammunition, indicia such as receipts, storage documents and electronic storage devices (and their contents,), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

3. Individuals involved in illegal firearms trafficking often keep firearms in their residences, garages, outbuildings, storage areas, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

4. Firearms traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal firearms trafficking includes travel itineraries, airline tickets, receipts, passports, and visas. These items are stored by traffickers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in vehicles. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

5. Firearms traffickers often use storage facilities for firearms and ammunition that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide firearms, ammunition, contraband, money and other valuables. Firearms traffickers often keep documents and other items tending to show the existence of other firearms, ammunition, contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and in vehicles. This type of documentation can be stored on digital media and concealed virtually anywhere.

6. Other evidence of transportation, ordering, possession and trafficking of firearms can include the following: telephone bills to show numbers called by the trafficker (and hence potential associates), bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by traffickers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

7. Individuals involved in firearms trafficking may try to legitimize their profits. To accomplish this goal, traffickers may utilize foreign and/or domestic banking institutions

and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

8. Evidence of significant, unexplained income of traffickers, or for the acquisition and concealment of money and assets, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

9. The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for firearms traffickers. Information stored in electronic form on all of the above devices can provide evidence of firearms trafficking. Traffickers frequently use some or all of these devices to communicate with co-conspirators, associates, straw purchasers, and others involved in the trafficking of firearms. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia

Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of firearms trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the trafficker is calling, and thus the identity of potential associates.

10. Firearms traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their firearms. They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives. Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Traffickers frequently use these devices to take their photographs and videos.

11. Firearms traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves. They may transport these firearms and ammunition to various residences in which they reside. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

12. Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized. Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts. These documents

may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

## **CONCLUSION**

13. Based on the foregoing, I respectfully submit that probable cause exists to search the SUBJECTS RESIDENCE described in ATTACHMENT A, for evidence, fruits, and instrumentalities of 18 U.S.C. § 933(a)(3): Conspiracy to Commit Trafficking in Firearms, as described in ATTACHMENT B.

Respectfully submitted,

TAYLOR NEEDLEMAN

Digitally signed by TAYLOR NEEDLEMAN
Date: 2025.04.22 09:01:07 -07'00'

Taylor Needleman, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Electronically submitted and telephonically sworn, this 22nd day of April, 2025.

Hon. D. Thomas Ferraro
United States Magistrate Judge

# EXHIBIT F